**COLUMBIA/HCA HEALTHCARE CORP., et al., Appellants,**

v.

**David W. COTTEY, Appellee.**

**No. 10–00–337–CV.**

Court of Appeals of Texas, Waco.

March 6, 2002.

Nancy L. Patterson, Mark D. Temple, Littler & Mendelson, Houston, for appellants.

John S. Morgan, Snider & Morgan, Beaumont, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

BILL VANCE, Justice.

In 1992, David Cottey was working as the chief financial officer of Heights Hospital in Houston, Texas. Heights Hospital was acquired by Appellant, West Houston Healthcare Group, Ltd. ("West Houston"), a limited partnership in which Columbia Healthcare Corporation had been involved since 1991. In 1994, Columbia Healthcare Corporation merged with HCA and became Columbia/HCA Healthcare Corporation ("Columbia"), the second Appellant in this case. The third Appellant, Silsbee Hospital, Inc. d/b/a/ Silsbee Doctors Hospital ("Silsbee"), operates a hospital owned

by Columbia where Cottey went to work in 1993. Cottey eventually sued all three Appellants on multiple claims, and they have appealed from a judgment holding them jointly and severally liable for close to $500,000 in damages.

Cottey was offered an attractive financial package if he would stay on as chief financial officer of Heights Hospital after West Houston acquired it. Although there is a dispute over whether Cottey was hired by West Houston, Columbia, or both, a letter dated April 17, 1992, introduced into evidence at trial, offering him the position and describing his financial incentives, was from Russell Harms, Vice–President–Controller of "Columbia Hospital Corporation–Southwest Division." Part of Cottey's compensation was participation in an executive "Top Hat Plan," which provided a large bonus when the investment plan fully vested in the sixth year of its existence. The parties agree that when he was hired, Cottey was not given a written description of the plan, and he was not told the plan could be rescinded at the discretion of the company. The plan was mentioned, although not specifically by name, in the letter from Harms. Cottey testified at trial that the existence of the plan was crucial to his accepting employment with West Houston.

In March 1993, for the first time, Cottey received a written description of the Top Hat Plan from Russell Schneider, President of "Columbia Hospital Corporation Southwest Division." For an initial investment of $36,000, Cottey's interest in the plan would become fully vested on the first day of the sixth year of his employment at $240,000. Vesting was to occur according to a schedule with most of the return vesting in the last three years. The vest-

ing period was allowed to begin before Cottey's actual date of employment. A provision in one of the documents reads in part: " ... the Committee has authority to prescribe, amend and rescind the Plan and any rules and regulation relating to the Plan. All Committee interpretations, determinations and actions shall be binding on all parties." After reviewing the documents, in August 1993 Cottey completed the necessary forms to participate in the Plan, and made an initial contribution of $18,000 of his own money plus another $18,000 which he borrowed on an unsecured promissory note.[1] Cottey testified at trial he did not realize the company could rescind the Plan at its discretion.

Cottey transferred to Silsbee in July 1993 and became its chief executive officer. In September 1995, Silsbee instituted a severance pay plan for employees who were terminated due to a staff reduction or because their positions were eliminated. The plan did not apply to employees terminated "for cause."

The Top Hat Plan was rescinded in June 1995. Cottey found out by a memorandum from Columbia. His vested interest, accrued over three years, was $72,000. Subtracting the $18,000 he had borrowed to invest, the plan paid Cottey $54,000. Because the six-year vesting period had not expired, Cottey did not realize the full $240,000 (minus $18,000) return he would have if the plan had fully vested.[2] Cottey complained but was told that the plan by its express terms allowed for rescission at the company's discretion.

Cottey continued to work at Silsbee, although he was informed by his supervisor, Luis Silva, that his position was soon to be eliminated in the course of a reorganiza-

---

1. Because the participation agreement was executed by West Houston, we assume the $18,000 was borrowed from it.

2. A difference of $168,000.

tion plan. In July 1997, Cottey made a written complaint about the rescission of the Top Hat Plan. He wrote: "I have been doing contracts for 23 years; I know what it says. I want a sincere response from you on why the cancellation of your commitment to me is justified, and is the right thing to do." He got no response.

In August 1997, Cottey was approached by doctors at Silsbee who persuaded him to allow a birthday surprise for another doctor in which a female dancer would perform in the hospital's operating room. The day after the "surprise," the husband of a nurse at Silsbee filed a complaint. The local newspaper was also informed about the incident. An investigation was conducted by Silva, and Cottey was fired in September. He was told there was an "uproar from the community" over the incident, and he was being fired "for cause" in that he "allowed an atmosphere in the hospital where the doctors felt comfortable in [having the party]." He was given two months severance pay.[3]

In August 1998, Cottey sued the Appellants for fraudulently inducing him into an employment contract, breach of employment contract, wrongful discharge, and breach of the severance-pay provision. After a trial in April 2000, the jury found that each of the Appellants had fraudulently induced Cottey into the contract and had breached the severance pay provision,[4] and awarded him approximately $375,000 in damages. He also recovered prejudgment interest, attorney's fees and expenses of $50,000, and postjudgment interest. The judgment held all three Appellants jointly and severally liable.

Appellants bring nine issues which we group as follows:

1.  Issues One, Two, Three, and Four: The evidence is legally and factually insufficient (a) that Cottey was fraudulently induced into the employment contract, and (b) to support the damages awarded for fraudulent inducement, because they are based on a wrongful discharge which is a claim not presented to the jury. Furthermore, Cottey ratified or waived any fraudulent inducement by continuing his employment for two years after learning the Top Hat Plan was rescinded, and the jury should have been instructed about ratification and waiver.

2.  Issues Six, Seven, and Eight: The evidence is legally and factually insufficient that the severance pay provision was breached. Furthermore, Cottey had no right to severance pay because it was not a legally enforceable provision of his employment contract, and the issue should not have been presented to the jury.

3.  Issue Five: Columbia and Silsbee cannot be jointly and severally liable with West Houston for damages on the fraudulent inducement claim, because they are not "successors-in-interest" to West Houston, the only original party to the contract with Cottey.

4.  Issue Nine: The amount of attorney's fees and costs was inappropriate and excessive.

We will reverse the judgment in part and modify and affirm it in part.

---

3. Cottey claims he was due twelve months pay under the severance plan.

4. Cottey abandoned the breach of employment contract and wrongful discharge claims and they were not presented to the jury. The jury failed to find that a contract for a Top Hat Plan bonus had been breached.

## FRAUDULENT INDUCEMENT

In issues One, Two, Three, and Four, Appellants complain about the fraudulent inducement claim. Specifically, they claim Cottey ratified or waived any fraudulent inducement by continuing his employment after learning the Top Hat Plan could be rescinded. Therefore, the jury should have been instructed not to find fraudulent inducement if it found ratification or waiver. Furthermore, they claim that the evidence is legally and factually insufficient (a) that Cottey was fraudulently induced into the employment contract, and (b) to support the damages awarded for fraudulent inducement.

### *Ratification and Waiver*

■ Appellants contend that, because Cottey continued to work at Silsbee for years after he learned in 1993 from Top Hat Plan documents that the plan could be rescinded, there was a fact issue about whether Cottey ratified the rescission provision or waived any complaint about it. The cases cited by Appellants have to do with "breach of contract" actions wherein the defendant claims an employment-at-will contract was modified, not breached, and that the plaintiff received notice of the modification and accepted it, at least constructively, by continuing to work for the employer. *Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 228–29 (Tex.1986); *Gamble v. Gregg County*, 932 S.W.2d 253, 255–56 (Tex.App.-Texarkana 1996, no writ). Cottey abandoned his breach of contract claim at trial. He did not claim the contract was modified after he was hired. His complaint is that the contract stayed the same, but its rescission provision was not disclosed to him until after he was hired. The jury was charged concerning the tort of fraudulent inducement.

■ A party fraudulently induced into a contract can under some circumstances ratify the contract or waive its claim of fraud. However, "[t]he question . . . is largely one of intent. Hence acts done in affirmance of the contract can amount to a waiver of the fraud only where they are done with full knowledge of the fraud and of all material facts, and with the intention, clearly manifested, of abiding by the contract and waiving all right to recover for the deception. Acts which, although in affirmance of the contract, do not indicate any intention to waive the fraud, cannot be held to operate as a waiver." *Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d 671, 677 (Tex.2000) (quoting *Kennedy v. Bender*, 104 Tex. 149, 135 S.W. 524, 525 (1911)). Cottey continued to complain about the rescission of the plan. Under *Kennedy*, he did not ratify the fraud or waive his right to complain about it, and the court was not required to submit instructions about either theory.

### *Standards of Review for Sufficiency of the Evidence*

In several issues, Appellants complain about the legal and factual sufficiency of the evidence to support the jury's finding that they fraudulently induced Cottey to accept the position offered him. Cottey had the burden of proof on all these issues.

■ When we review whether the evidence is legally sufficient, we consider only that evidence and the inferences therefrom which support the jury's finding, considered in the light most favorable to the finding, and disregarding contrary evidence and inferences. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995); *Holt Atherton Industries, Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992). We will find the evidence legally insufficient if: (1) there is a complete absence of evidence for the finding, (2) there is evidence to support the finding, but rules of law or evidence bar the court from giving any weight to the evidence, (3) there is no

more than a mere scintilla of evidence to support the finding, or (4) the evidence conclusively establishes the opposite of the finding. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L.Rev. 361, 362–63 (1960)). "More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome*, 907 S.W.2d at 499 (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994)).

▮▮▮▮ To determine whether the evidence is factually sufficient, we must consider all the evidence in the record both for and against the jury's finding, and we can find the evidence factually insufficient only if we conclude that the finding is so contrary to the overwhelming weight of the evidence as to be clearly *wrong* and *unjust*. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Checker Bag Co. v. Washington*, 27 S.W.3d 625, 633 (Tex.App.-Waco 2000, pet. denied). Reversal could occur because the finding was based on weak or insufficient evidence, or because the proponent's proof, although adequate if taken alone, is overwhelmed by the opponent's contrary proof. *Checker Bag*, 27 S.W.3d at 633 (citing William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L.Rev. 515, 519 n. 11 (1991)). However,

we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex.1998) (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex. 1986)). If we find the evidence to be factually sufficient, we are not required to detail all the evidence supporting the finding; if we find the evidence to be factually insufficient, we must detail all the evidence relevant to the issue and clearly state why the jury's finding is manifestly unjust. *Maritime Overseas*, 971 S.W.2d at 407 (citing *Ellis County State Bank v. Keever*, 888 S.W.2d 790, 794 (Tex.1994)).

## *False Representation*

The jury was charged that the elements of fraudulent inducement are:

(1) a material representation;

(2) which was false;

(3) which was either known to be false when made or made recklessly without knowledge of its truth;

(4) which was intended to be acted or relied upon;

(5) which was relied upon; and

(6) which caused injury or damage.

*E.g. Formosa Plastics v. Presidio Engineers*, 960 S.W.2d 41, 47 (Tex.1998); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434–35 (Tex.1986).[5] Appellants argue that the evidence is legally and factually

---

5. This charge is more suited to a case involving fraud by an express false promise. Fraud by concealment, as in Cottey's case, is more appropriately charged as:

Fraud may also occur when:

a. a party conceals or fails to disclose a material fact within the knowledge of that party,

b. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

c. the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

*See Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2000) (charge quoted); *Formosa Plastics v. Presidio Engineers*, 960 S.W.2d 41, 47 (Tex. 1998) (elements of fraudulent concealment).

insufficient to support a finding of a misrepresentation by them to Cottey or of a duty by them to ensure that Cottey understood every aspect of the plan. They argue that a misrepresentation cannot occur by silence, *i.e.*, by failure to disclose information that ought to be.

Cottey pled that Appellants represented that he would have a six-year employment contract, including the six-year investment plan, that those representations were false, known to be false, and made with intent that he rely on them, and that he did rely on them to his detriment. We begin with the challenge to the legal sufficiency of the evidence, looking only at the evidence that favors the jury's finding and ignoring all evidence to the contrary.

■■■■■ Fraud requires a material misrepresentation that was false; was either known to be false when made or was asserted without knowledge of its truth; was intended to be acted on; was relied on; and caused injury. *See Samedan Oil Corp. v. Intrastate Gas Gathering, Inc.,* —— S.W.3d ——, ——, 2001 WL 1153443, *5 (Tex.App.-Tyler September 28, 2001) ("The element of misrepresentation can be demonstrated in a variety of ways including by way of false promise or by way of concealment by silence."); *Lesikar v. Rappeport,* 33 S.W.3d 282, 299 (Tex.App.-Texarkana 2000, no pet.) (citing *Formosa Plastics,* 960 S.W.2d at 47). "When ... the complaint is that the other party violated a 'duty to speak,' silence may be as misleading as a false representation." *Sears, Roebuck & Co. v. Meadows,* 878 S.W.2d 171, 175 (Tex.App.-Waco 1993), *rev'd on other grounds,* 877 S.W.2d 281 (1994); *Spoljaric,* 708 S.W.2d at 435; *State Nat'l Bank v. Farah Mfg. Co.,* 678 S.W.2d 661, 681 (Tex.App.-El Paso 1984, writ dism'd agr.). Silence is equivalent to a false representation where circumstances impose a duty to speak and one deliberately remains silent. *Spoljaric,* 708 S.W.2d at 435. Fraud by false promise and fraud by concealment are not fraud theories distinct from fraudulent misrepresentation, but rather are separate theories by which the misrepresentation element of fraud can be proven. *Samedan Oil,* —— S.W.3d at ——, 2001 WL 1153443, *5.

■■■■■ For fraud by nondisclosure to be actionable, there must be a duty to disclose. *Id.; Hoggett v. Brown,* 971 S.W.2d 472, 487–88 (Tex.App.-Houston [14th Dist.] 1997, pet. denied). Whether such a duty exists is a question of law. *Samedan Oil,* —— S.W.3d at ——, 2001 WL 1153443, *5. A duty to disclose may arise in four situations: (1) where there is a special or fiduciary relationship; (2) where one voluntarily discloses partial information, but fails to disclose the whole truth; (3) where one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue; and (4) where one makes a partial disclosure and conveys a false impression. *Id.* (citing *Hoggett,* 971 S.W.2d at 487; *Formosa Plastics,* 941 S.W.2d at 146–47).

■■■■■ There is no dispute that when Cottey was hired, he was told he would participate in the Top Hat Plan and his interest would vest in six years. Furthermore, it is not disputed that Appellants made only a partial disclosure about the plan because they did not tell Cottey about the rescission provision. This partial disclosure conveyed a false impression to Cottey about his financial future if he accepted the position. We find that Cottey's testimony that no one told him, orally or in writing, that the plan could be rescinded in the future at the discretion of the company, follows his pleadings and supports a finding by the jury that Appellants represented to him, by their silence about the rescission provision, that the plan would

continue for the full six years. Thus, we find legally sufficient evidence of an affirmative misrepresentation by silence. *Havner*, 953 S.W.2d at 711.

Turning to the factual sufficiency challenge, we note that Appellants did not dispute what Cottey said he was told about the Top Hat Plan and did not offer any evidence that Cottey was told that the plan might be terminated. Examining all the evidence on the issue, we do not find the evidence supporting the jury's finding to be so weak or contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176; *Checker Bag*, 27 S.W.3d at 633. It is therefore factually sufficient.

### "Knowing Misrepresentation" and "Intent"

Next, Appellants say the evidence was legally and factually insufficient to justify a finding of "fraudulent intent." An examination of the elements of fraudulent misrepresentation shows that the promisor's "intent" is involved in only one element, *i.e.*, intent that the representation be acted or relied upon. Appellants focus on whether Cottey proved that at the time he accepted employment, Appellants intended not to carry out the plan. This pertains more to the element of whether the misrepresentation they made (the omission) was made knowingly or recklessly. The proper question as to the element of "intent" is whether Cottey proved that, at the time he accepted employment, Appellants intended for Cottey to act or rely on their partial disclosure about the plan which omitted mention of the rescission provision. The action and reliance occurred when Cottey accepted the position.

Again, to determine legal sufficiency, we look only to the evidence and inferences supporting the jury's finding. It is not in question that Russell Harms knew the plan could be rescinded at any

time at the discretion of the company and failed to disclose it. Thus, there is no dispute as to that issue. As for "intent," a party's intent at the time of the representation can be inferred from the party's subsequent actions. *Spoljaric*, 708 S.W.2d at 434. Although failure to perform, standing alone, cannot establish fraudulent intent, slight circumstantial evidence of fraud, when considered with the breach of a promise to perform, is sufficient to support a finding of fraudulent intent. *Samedan Oil*, —— S.W.3d at ——, 2001 WL 1153443, *7 (citing *Spoljaric*, 708 S.W.2d at 435); *Maulding v. Niemeyer*, 241 S.W.2d 733, 738 (Tex.Civ.App.-El Paso 1951, orig. proceeding). There was evidence that Russell Harms knew the plan could be rescinded, failed to disclose that to Cottey, failed to timely furnish Cottey with documentation from which he could ascertain that the plan could be rescinded at any time after he accepted employment, and made representations of a large financial return from the plan at the end of six years. That he intended for Cottey to rely on his conduct can be inferred. *Spoljaric*, 708 S.W.2d at 434. The plan was, however, rescinded before Cottey's rights fully vested. Thus, there is some evidence to support the element of intent that Cottey would act or rely on the omission about the rescission provision. *Havner*, 953 S.W.2d at 711.

Furthermore, considering all the evidence that bears on this question, we do not find that the evidence supporting the findings of "knowing misrepresentation" and "intent" are so weak or contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176; *Checker Bag*, 27 S.W.3d at 633. The evidence is therefore factually sufficient.

We overrule Appellants' issues relating to sufficiency of the evidence to support

the jury's finding of fraudulent misrepresentation.

## Damages

Appellants claim the evidence is legally and factually insufficient to support the $277,000 awarded by the jury as damages for fraudulent inducement. Question one of the charge asked if Cottey had been fraudulently induced by any of the three defendants "to enter into employment." The jury answered "yes" as to each defendant. Question two asked: "What sum of money, if paid now in cash, would fairly and reasonably compensate David W. Cottey for the fraudulent inducement by any of the Defendants that you have found committed fraudulent inducement, if any? Do not include interest on any amount of damages. Answer in dollars and cents." No other instructions or definitions were provided.

Appellants assert on appeal:

1. The evidence is legally insufficient because there is no evidence that Cottey suffered injury *as the result of* any fraudulent inducement. He was an "at-will" employee, and as such he cannot show entitlement to future earnings.

2. The evidence is legally insufficient because Cottey's evidence of damages pertains only to damages for a wrongful discharge claim, not fraudulent inducement. Therefore, there is no evidence of damages for fraudulent inducement.

3. The evidence is factually insufficient because the jury's negative answer to Question three about whether the defendants "breach[ed] a contract for a Top Hat Plan bonus" is inconsistent with an award for damages based on the $168,000 Cottey claims he should have been paid under the Top Hat Plan.

4. The evidence is factually insufficient because damages other than the $168,000 are based on future benefits which Cottey was not guaranteed as an "at-will" employee.[6]

Assertions one and four pertain to future damages. As to the first, as Appellants agree in their brief, most of the $277,000 in damages the jury awarded were based on the $168,000 difference between what Cottey received when he "cashed-out" when the plan was rescinded and what he would have realized had the plan remained in effect for six years. As Appellants point out, this measure of damages is based on a presumption that if the plan had not been rescinded, Cottey would have been employed by Appellants when the plan fully vested. Appellants insist that as an at-will employee, Cottey cannot sustain this presumption. We disagree. Cottey does not argue on appeal that he was not an at-will employee;[7] he abandoned his wrongful discharge claim at trial and that issue was not presented to the jury. Cottey was terminated in August 1997. Because Cottey was credited for time while employed at Heights Hospital, the plan would have fully vested as to him

---

6. Cottey presented evidence of amounts he would have received had he not been fired, including $25,000 in stock options which would have vested after his termination date, $58,850 in bonuses he would have received, and the remainder of his salary had he continued to be employed for a full six-year period.

7. As such, he could be fired at any time and for any reason. *E.g. Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex.1998). Whatever damages he may have been entitled to for fraudulent inducement cannot be based on a future period of employment to which he had no guarantee. *See Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 866 (5th Cir.1999).

in January 1997. Therefore, the $168,000 are not "future damages."

■ As for the fourth assertion about other damages which may have accrued only in the future, the charge did not segregate past and future damages. Appellants did not object to Question two as required under Rule 274. Tex.R. Civ. P. 274. Therefore, the objection and any complaint based thereon are waived. *See Wilgus v. Bond,* 730 S.W.2d 670 (Tex.1987) (complaint waived as to unobjected-to charge question allowing award of elements of damages unrecoverable under the legal theory at trial); *Hruska v. First State Bank of Deanville,* 747 S.W.2d 783, 785 (Tex.1988) (complaint waived as to unobjected-to charge question allowing award of attorney's fees for matters for which attorney's fees are not allowed at law) (citing *Aero Energy, Inc. v. Circle C Drilling Co.,* 699 S.W.2d 821, 823 (Tex. 1985); *Matthews v. Candlewood Builders, Inc.,* 685 S.W.2d 649, 650 (Tex.1985)); *Casteel–Diebolt v. Diebolt,* 912 S.W.2d 302, 304 (Tex.App.-Houston [14th Dist.] 1995, no writ) (failure to object to omissions from the charge is a waiver of the complaint which estops a party from complaining on appeal about the omissions); *see also Green Intern., Inc. v. Solis,* 951 S.W.2d 384, 389 (Tex.1997) (complaint on appeal is waived when a damages question on attorney's fees which fails to segregate the fees among various claims, some of which do not allow for recovery of the fees, is submitted without objection, and the evidence is sufficient to support the award); *Iron Mountain Bison Ranch, Inc. v. Easley Trailer Manufacturing, Inc.,* 42 S.W.3d 149, 156–57 (Tex.App.-Amarillo 2000, no pet.) (Reversal is required when a damages question incorporates a legally-incorrect measure of damages only if there was a Rule 274 objection made) (citing *Crown Life Insur. Co. v. Casteel,* 22 S.W.3d 378, 388 (Tex.2000) (an objected to broad-form submission of multiple theories of liability requires reversal)).

■ The second assertion is that Cottey's evidence on damages pertains only to a wrongful discharge claim. But again, Appellants did not object to the damages question as required by Rule 274, and therefore they cannot complain on appeal that incorrect measures of damages may have been considered by the jury. (*See* cases cited *id.*).

■ Finally, the third assertion is that because the jury found no breach of a "contract for a Top Hat Plan bonus," there can be no finding of $168,000 in damages based on the plan. But this ignores Plaintiff's theory of the case, which is that Appellants misled him into believing he would receive the $168,000 if he accepted employment and not a breach of contract claim. The measure of damages for fraud is the benefit-of-the-bargain damages he suffered as a result of the fraudulent inducement and later rescission of the Top Hat Plan. *Formosa,* 960 S.W.2d at 49; *Latham v. Castillo,* 972 S.W.2d 66, 70 (Tex.1998). If proved with reasonable certainty, damages may be awarded for the difference between the value as represented and the value received. *Formosa,* 960 S.W.2d at 49. Cottey's evidence passes this test as to the $168,000.

The damages issues are overruled.

### BREACH OF SEVERANCE PAY CONTRACT

In issues Six, Seven, and Eight, Appellants complain about the jury's verdict on the claim for breach of the severance pay plan. They claim that the severance plan was not a contractual obligation and that the issue should not have been presented to the jury. They also maintain that if it was a contractual obligation, the contract

was not breached, because its requirements, in particular that the termination not be "for cause," that the termination had to be due to a reduction in staff or elimination of a position, and that Cottey had to sign a separation agreement and release as a condition precedent to receiving severance pay, were not met.

### Enforceability of Severance Provision

■ Appellants claim that the severance pay plan was not a modification of Cottey's at-will contract, but was rather in the nature of an unenforceable promise. A policy or practice instituted unilaterally by an employer, even if rescindable at the employer's discretion, may create a contractual right for the employee if the employer intends to do so. *E.g. Gamble v. Gregg County*, 932 S.W.2d 253, 255 (Tex. App.-Texarkana 1996, no writ). The severance plan, entitled an "Official Policy/Procedure," was a single-page document signed by Columbia's chief executive officer and its senior vice president for human resources. It described who was and was not "eligible" for severance pay and included a list of reasons for termination which would disqualify. There was a schedule which "will be used to determine the severance pay for regular, full-time, corporate employees terminating at the request of the company due to a reduction in staff or position elimination." The schedule showed the number of weeks of severance pay an employee would receive based on years of employment and salary. A "Procedure" section required that a "Separation Agreement and General Release" be signed by an employee before becoming "eligible" for severance pay. Without so finding, we will treat the severance plan as a contractual obligation. We need not decide that matter because of our resolution of another of Appellants' issues.

### Eligibility for Receiving Severance

■ Appellants state that by the plan's express language, an employee was not eligible for severance pay if the employee (1) was fired "for cause," (2) did not sign a "Separation Agreement and General Release" at the time of termination, or (3) was not terminated "due to a reduction in staff or position elimination." Assuming without finding that Cottey was not fired over the birthday-surprise incident, and that Appellants waived the signing of the separation and release document, the evidence does not support a finding that Cottey was terminated "due to a reduction in staff or position elimination."

Michael Greene testified by deposition. When Cottey's employment was terminated in September 1997, Greene was hired as interim chief executive officer. In December, he was named chief executive officer. After he took over at Silsby, three physicians were added to the staff. Cottey's supervisor, Silva, testified that Greene was the chief executive officer at Silsby until the hospital was sold soon thereafter. Therefore, the evidence was uncontroverted that Cottey's position was not eliminated. In addition, there was no evidence of a reduction in staff. Accordingly, the evidence is legally insufficient to support the jury's finding that a severance pay contract was breached. *Merrell Dow*, 953 S.W.2d at 711 (the evidence conclusively establishes the opposite of the finding).

This issue is sustained.

## JOINT AND SEVERAL LIABILITY

In issue Five, Columbia and Silsbee object to being found jointly and severally liable for damages in the fraudulent inducement claim. They contend (1) the original contract negotiations were between Cottey and West Houston, and (2) Columbia did not come into existence until 1994 when HCA and Columbia Healthcare

Corporation merged. They made the same objection to the jury charge.

■ We agree as to Silsbee. Cottey had no dealings with Silsbee until July 1993, which is after he received the Top Hat Plan documents from Columbia in March, and long after beginning employment with West Houston's Heights Hospital in April 1992. Under the evidence, Silsbee could not have participated in the fraudulent inducement.

■ However, the facts are substantially different as to Columbia. From exhibits admitted at trial, it is undisputed that:

• The original letter-offer of employment to Cottey in April 1992 was from Russell Harms, Vice President–Controller, Columbia Hospital Corporation–Southwest Division. The letter began: "In order for you to finalize your decision concerning a future role at Heights Hospital with Columbia, I am prepared to make the following commitments to you: ... 5) An investment contract with West Houston Healthcare Group in the range of $250,000 $300,000. As we discussed, this would have a 6 year vesting period and would be dependent upon obtaining net income targets."

• When the Top Hat Plan documents were sent to Cottey in March 1993, they came from Russell Schneider, President, Columbia Hospital Corporation–Southwest Division. The letter said: "Columbia Hospital Corporation is very excited ... and looks forward to your participation ..."

• Russell Harms was also Vice President of West Houston.

■ Under these facts, Cottey's original contract negotiations were with both West Houston and Columbia Healthcare Corporation. The only remaining question is whether Appellant Columbia is a successor-in-interest by virtue of the 1994 merger of HCA and Columbia Healthcare Corporation.[8]

When two corporations merge and become a third,[9] "the separate existence of every domestic corporation that is a party to the merger, except any surviving or new domestic corporation, shall cease." TEX. BUS. CORP. ACT ANN. art. 5.06, § A(1) (Vernon Supp.2002). However, the debts, liabilities, and obligations of the merged corporations are transferred to the new corporation. *Id.* art. 5.06, § A(3); *Bailey v. Vanscot Concrete Co.*, 894 S.W.2d 757, 759 (Tex.1995) (citing *Vulcan Materials Co. v. United States*, 446 F.2d 690, 694 (5th Cir.)); *North American Land Corp. v. Boutte*, 604 S.W.2d 245, 246 (Tex.Civ.App.-Houston [14th Dist.] 1980, writ ref'd n.r.e.). Therefore, Columbia/HCA is liable as a successor for any tortious conduct by Columbia Healthcare Corporation.

This issue is sustained as to Silsbee, and overruled as to Columbia.

## ATTORNEY'S FEES

■ In issue Nine, Appellants complain that the amount of attorney's fees and costs was inappropriate and excessive. Cottey is entitled to attorney's fees only if he prevails on the severance pay claim.

---

**8.** In Appellants' brief, they assert that "[i]n 1994, Columbia Healthcare Corporation merged with HCA and ceased to exist. The new, merged entity known as Columbia/HCA Healthcare Corporation ("Columbia/HCA") was formed. Columbia/HCA is a named Defendant in this case." APPELLANTS' BRIEF p. 4.

"In a civil case, the court will accept as true the facts stated [in Appellant's brief] unless another party contradicts them." TEX.R. APP. P. 38.1(f).

**9.** TEX. BUS. CORP. ACT ANN. art. 5.01 (Vernon Supp.2002).

Because we have sustained Appellants' issue on that claim, we sustain Appellants' issue on attorney's fees.

## CONCLUSION

We reverse and delete that part of the judgment awarding damages for breach of the severance pay plan, attorney's fees, and prejudgment and postjudgment interest on these amounts. We further modify the judgment to provide that West Houston and Columbia are jointly and severally liable and that Cottey take nothing from Silsbee. As modified, we affirm the judgment.

Justice GRAY concurring.

TOM GRAY, Justice, concurring.

### Fraudulent Inducement

This is a fraudulent inducement case. The jury was not instructed that a fraudulent representation could be made by failure to disclose information that required disclosure, or by a present intent to not perform a promise regarding future conduct. Accordingly the entire discussion in the majority opinion about a duty to disclose and fraud by silence is not applicable. Accordingly, I do not join in any of the discussion of the majority on this issue.

We are required to review the sufficiency of the evidence to support the jury's answer based on the charge submitted. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.2000). This case was presented to the jury as an affirmative misrepresentation case. Cottey's theory, and evidence, was that during negotiation for employment it was affirmatively represented to him that all he had to do to enjoy the benefit of the "Top Hat" plan was to be employed for a period of six years. The evidence was sufficient to establish that this representation was made, it was material to Cottey's decision, was false, was known to be false at the time it was made, was intended to be relied upon, and was relied upon. Accordingly, without weighing the credibility of the witnesses, the jury's answer to the issue of fraudulent inducement is supported by legally and factually sufficient evidence.

Appellants contend there is insufficient evidence that their failure to disclose that the "Top Hat" plan could be terminated was intended to induce Cottey to accept employment. What Appellants have failed to appreciate is that the element of fraud that the representation be made with the intent for it to be relied upon, is not the failure to disclose information that would have modified the representation actually made. The intent required is that the affirmative representation that was made, was made with the intent that Cottey rely upon it. There is no dispute that the affirmative representation regarding the "Top Hat" plan was made with the intent that Cottey rely upon it.

### Damages

Whether Cottey will be allowed to recover an improper measure of damages for fraudulent inducement because of a defective charge is not an easy question to answer. There is no dispute the testimony supported more than $277,000 of damages. But the only way the jury could have arrived at their verdict of $277,000 for damages is to include elements related to future damages which are not recoverable for fraudulent inducement.

We have determined that because there was no objection to the charge as submitted, the defendants cannot complain now that the jury awarded damages which would not otherwise be recoverable for fraudulent inducement. In effect the issue is whether the charge as worded limited the jury's consideration to the damages

caused by the fraudulent inducement or whether the jury was allowed to aggregate the testimony regarding any type of damages and award it as damages for fraudulent inducement.

The charge did not require the jury to find that the damages were "proximately caused" by the fraudulent inducement. The conditional submission of the damages question provided the jury no guidance on what damages they could award based on their finding that Cottey had been fraudulently induced. There was no instruction on what a proper measure of damages for fraudulent inducement would be, nor an instruction limiting the elements of damages that could be included.

Thus, the only limitation on the jury's consideration of what damages they could award was based on the question submitted. The question submitted to the jury was: "What sum of money, if paid now in cash, would fairly and reasonably compensate David W. Cottey **for the** fraudulent inducement by any of the Defendants that you have found committed fraudulent inducement, if any?" (emphasis added). For this analysis, the question is: Do the words "for the" provide any limitation on the elements of damages the jury can award for the fraudulent inducement. They do not.

Thus, the question as worded did not limit the jury's consideration of damages, and because there was no objection to the failure of the charge to limit the jury's consideration to proper elements of damages, the jury could consider evidence of any damages. *Wilgus v. Bond,* 730 S.W.2d 670, 672 (Tex.1987); *see also Religious of Sacred Heart of Texas v. City of Houston,* 836 S.W.2d 606, 614 (Tex.1992); *Cosgrove v. Grimes,* 774 S.W.2d 662, 665–66 (Tex. 1989) (Although damages issues defectively submitted, defendant "failed to object to them by distinctly pointing out any er-

ror"); *Houston Mercantile Exchange Corp. v. Dailey Petroleum Corp.,* 930 S.W.2d 242, 246–47 (Tex.App.-Houston [14th Dist.] 1996, no writ) ("Because the types of damages Dailey was claiming were not specified in its petition, the jury charge or Dailey's jury argument, we have only the evidence presented at trial by which to both identify the types of damages Dailey sought and assess the sufficiency of the evidence supporting those damages."); *American Transfer & Storage Co. v. Reichley,* 560 S.W.2d 196, 199–200 (Tex.Civ.App.-Amarillo 1977, writ ref'd n.r.e.) ("Unless a party objects to the charge on the ground that it submits an improper measure of damages, he waives the objection and cannot complain on appeal that the charge permitted the jury to find damages based on the wrong measure.").

Conversely, a damage question which does not properly limit the jury's consideration to recoverable damages, when properly objected to, requires reversal. *Stewart & Stevenson Services, Inc. v. Serv-Tech, Inc.,* 879 S.W.2d 89, 101–02 (Tex. App.-Houston [14th Dist.] 1994, writ denied); *see also Dawson v. Garcia,* 666 S.W.2d 254, 261 (Tex.App.-Dallas 1984, no writ) ("The Garcias admit, however, that Dawson did voice the following language to the trial court in his objection: 'Further, because the jury's finding as it's now arranged would be impossible to divide with regard to what portion relates to nonrecoverable items and damage and what-not.' ").

With these additional comments I concur in the judgment.